UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | } | |
| DARRYL K. SHADINGER and SHIRLIE H. SHADINGER, | } | CASE NO. 05-44392-JJR-7 |
| Debtor(s). | } | CHAPTER: 7 |

| | | |
|---|---|---|
| HIGH COTTON ENTERPRISES, INC. Plaintiff(s), | } | ADV. P. NO.: 06-40053 |
| v. | } | |
| DARRYL K. SHADINGER, Defendant(s). | } | |

## MEMORANDUM OPINION

Darrell K. Shadinger ("Defendant" and "Debtor") and his wife filed a chapter 7 bankruptcy petition in this Court on October 14, 2005. On March 6, 2006, High Cotton Enterprises, Inc. ("High Cotton" and "Plaintiff") commenced this adversary proceeding against the Debtor.[1] In its complaint, the Plaintiff claims the Defendant is personally liable for an unpaid open account incurred through a series of credit sales by the Plaintiff to Char-Pen-Shir Hosiery, Inc. ("CPSH"). CPSH was a corporation owned and controlled by the Defendant and his brother. More importantly, the Plaintiff asserts the debt was incurred as a consequence of the Defendant's false representations. Thus, according to the Plaintiff, under sections 523(a)(2)(A) and 523(a)(6) of the Bankruptcy Code (11

---

[1] The complaint makes no claims against the Defendant's wife, who is a co-debtor in the underlying bankruptcy case..

U.S.C. *et seq* and herein the "Bankruptcy Code"), the Defendant should not be discharged from his liability for this particular debt. Also in its complaint, the Plaintiff claimed that due to various other wrongdoings, and pursuant to section 727 of the Bankruptcy Code, the Defendant is not entitled to receive a general discharge in his Chapter 7 bankruptcy case. However, before trial commenced, the Plaintiff dismissed all claims asserted under section 727, and at trial the Plaintiff focused on its claims based on section 523(a).

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) and (J). This Opinion shall constitute the Court's findings of fact and conclusions of law following the trial that took place in Gadsden, Alabama on September 20, 2006.

## FACTS

High Cotton manufactured and supplied unfinished textiles (i.e. greige goods), including cotton athletic socks. CPSH was a textile finisher and finished cotton socks purchased from a supplier of unfinished textiles, like High Cotton. CPSH would take the unfinished socks and bleach, border, pair, bag and band them into a finished product ready for retail sale.

High Cotton was owned and managed by Wesley Neighbors and Derek Caldwell. The Defendant and Caldwell were friends, and they and their families socialized and ate together from time to time. During the years 1998, 1999 and 2000, CPSH was purchasing unfinished textiles from High Cotton. High Cotton would fill purchase orders, and payment would be made on a revolving open account basis. Because of CPSH's consistently poor payment habits, in November 2000 High Cotton stopped filling CPSH's purchase orders.[2]

---

[2] With the exception of a small amount that may have been in dispute, CPSH did eventually pay the balance due on the account that arose from the 1999-2000 sales.

In early 2002, a representative of Ellis Hosiery ("Ellis") contacted the Defendant. Ellis held the exclusive right to use the Reebok logo on athletic socks and asked the Defendant if CPSH would have an interest in supplying finished Reebok socks. To provide finished socks to Ellis, CPSH would need a reliable source of unfinished socks. The Defendant asked Neighbors and Caldwell if High Cotton would be willing to supply the unfinished socks to CPSH. In light of CPSH's poor payment history that had led to High Cotton terminating their prior relationship in 2000, the principals of High Cotton were concerned about renewing the business. However, because of the friendship between Caldwell and the Defendant, and because it appeared the Ellis-Reebok orders could be substantial and profitable for both High Cotton and CPSH, High Cotton agreed to supply the unfinished socks.[3] There was no tri-party agreement; High Cotton made its deal with CPSH, who in turn made a separate deal with Ellis. In fact, there was no written agreement between High Cotton and CPSH; the unfinished socks were supplied through a series of purchase orders, and like the 1999-2000 sales, High Cotton extended credit to CPSH on a revolving, open account, with payment terms of net 30 days. No one with High Cotton or CPSH knew the exact terms of the contract between Ellis and Reebok or whether it was ever reduced to writing.

The business between High Cotton and CPSH was brisk. It appears from High Cotton's records that the first order for unfinished Reebok socks was filled in March 2002, and by May CPSH's account balance exceeded $300,000. During the course of their renewed relationship, CPSH became High Cotton's largest customer, and almost all of CPSH's sales were for the Reebok socks sold to Ellis. Although substantial and frequent payments were made on the account[4], after the first

---

[3] Although the socks supplied by High Cotton were unfinished, the Reebok logo was placed on the socks by High Cotton before they were delivered to CPSH for finishing.

[4] Neighbors testified that during the three years unfinished Reebok socks were supplied to CPSH, its payments to High Cotton totaled over $5 million. Unfortunately, when High Cotton

few months history began to repeat itself, and CPSH was again delinquent on its payments to High Cotton. The delinquency led to a series of ongoing meetings and phone calls among Neighbors and Caldwell on behalf of High Cotton and the Defendant and his brother on behalf of CPSH. According to Neighbors and Caldwell, the Defendant gave them repeated assurances that CPSH would eventually pay its account balance and that CPSH had sufficient inventory and future business to produce enough revenue to pay High Cotton.

Neighbors and Caldwell testified that the Defendant told them he would personally pay CPSH's debt if necessary for High Cotton to be paid. The Defendant denied giving such an unqualified guarantee to High Cotton, but he did admit he committed to use his personal assets to keep CPSH in business. The Defendant testified that he cashed out his retirement and life insurance, put a second mortgage on his home,[5] mortgaged acreage adjoining his home, and used the proceeds from these transactions as working capital for CPSH. According to the Defendant, he always intended for CPSH to pay High Cotton and never intended to cheat High Cotton. Caldwell testified that he did "not believe that the Defendant set out to beat us." However, after CPSH went out of business, Neighbors and Caldwell discovered information about CPSH's financial health and loan payments to other creditors that caused them to change their minds about the good intentions they had previously attributed to the Defendant's representations that CPSH would pay High Cotton.

No witness testified that High Cotton ever received or even requested financial statements from CPSH or the Defendant. The Defendant testified that CPSH's accountant attended one or more meetings with Neighbors and Caldwell, and financial statements would have been furnished to High

---

stopped filling its orders in February 2004, CPSH left high Cotton with an unpaid balance of $545,289.72.

[5]The Defendant testified that eventually the mortgage on his home was foreclosed.

Cotton if a request had been made. In any event, through discovery High Cotton obtained copies of CPSH's financial statements for the years 2001, 2002, 2003 and 2004. No one questioned the accuracy of these statements, and they revealed that at year-end 2001 the stockholder's equity (i.e. net worth) of CPSH was a negative $414,562, at year-end 2002 it was a negative $472,932, at year-end 2003 it was a negative $686,828, and at year-end 2004 it was a negative $882,368. The financial statements indicated that the net worth of CPSH worsened each year because of substantial operating losses incurred each year.[6]

After High Cotton stopped doing business with CPSH in 2004, Neighbors and Caldwell discovered that beginning in August 2001, CPSH had been making monthly payments of $10,000 plus interest to Inspirational Hosiery pursuant to an agreement that settled a lawsuit brought by Inspirational against CPSH and the Defendant. An initial $200,000 payment toward the settlement had been made from the proceeds of a bank loan obtained by CPSH that was also being repaid monthly. Furthermore, High Cotton discovered that CPSH had been making monthly payments of $750 to the Defendant and his brother to repay loans owed by CPSH to its two shareholders.

The gist of High Cotton's claim is that the Defendant must have known at the time he was giving assurances of payment to Neighbors and Caldwell that his statements were false because he was fully aware of CPSH's poor financial condition. Neighbors and Caldwell both testified that they would not have allowed CPSH to run up high account balances with High Cotton had they known CPSH had a negative net worth and operating losses, that CPSH was making payments to settle a lawsuit with another creditor (i.e. Inspirational Hosiery), and that CPSH was making loan payments

---

[6]A substantial portion of the negative equity appears to be attributable to accumulated depreciation, and a portion of the losses each year can be attributed to current-year depreciation. However, even after eliminating "paper losses" CPSH never came close to having a positive net worth or making a profit from operations during the years covered by the financial statements.

to its shareholders. High Cotton contends the Defendant had a duty to disclose these negative matters even though there was no request or other inquiry for this information. Finally, High Cotton asserts that even though the Defendant told Neighbors and Caldwell he would personally pay the balance due High Cotton, he never had the intention of doing so. As mentioned, the Defendant denies ever making a commitment to personally guarantee the indebtedness but does admit he committed to use his personal assets in an effort to keep CPSH afloat.[7]

High Cotton's witnesses testified the textile industry in the United States had been going through very difficult times, and several Alabama hosiery companies had gone out of business. Caldwell testified other textile finishers were "slow pay" and stated that virtually everyone in the hosiery business, including High Cotton, had problems paying their bills on time. According to Caldwell, most of the problems were attributable to the textile business moving outside the country as a result of NAFTA: domestic companies were finding it difficult to compete with foreign competition. Caldwell stated he knew CPSH was "slow" but believed it would eventually pay its bills.

LAW

All debts of a chapter 7 debtor are presumed dischargeable until a creditor challenging the discharge of a particular debt proves otherwise. *U.S. v. Fretz (In re Fretz)*, 244 F.3d 1323 (11th Cir. 2001). The creditor who raises such a challenge under section 523(a) of the Bankruptcy Code must prove his case by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279 (1991). And section 523(a) should be strictly construed in favor of a debtor. *Equitable Bank v. Miller (In re*

---

[7] The only material conflict in the evidence is whether the Defendant gave his unqualified personal guarantee of payment to High Cotton. If a guarantee was given by the Defendant, it was not in writing; however the Defendant did not raise the statute of frauds as an affirmative defense.

*Miller)*, 39 F.3d 301 (11th Cir. 1994).

In this case, unless the parol guarantee that the Plaintiff claims was made by the Debtor is enforceable, the Debtor is not otherwise contractually obligated for CPSH's debt. Nonetheless, if the Debtor enticed the Plaintiff by fraudulent means to extend credit to CPSH, he would be liable for the debt, not under a contract theory, but for the loss caused by his intentional misrepresentation or fraud.

The Plaintiff asserts that the debt is nondischargeable under section 523(a)(2)(A) and section 523(a)(6). The latter section is usually applied to losses caused by intentional torts and excepts from discharge any debt arising from the "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).

> "Conduct which may give rise to a nondischargeable debt under section 523(a)(6) may also be nondischargeable under other subsections of section 523(a). For example, debts procured by fraud may be nondischargeable under section 523(a)(6) as arising from conduct causing willful and malicious injury . . . . Three other subsections of section 523(a) make different sorts of debts procured by fraud nondischargeable. Consequently, in considering claims of nondischargeability under section 523(a)(6) arising from conduct which may give rise to nondischargeability of a debt under other subsections of section 523(a), courts must be careful to preserve the elements of nondischargeability and limitations on nondischargeability found in other, more specific other [sic] subsections of section 523(a) to prevent section 523(a)(6) from rendering superfluous those other subsections."

4 Collier on Bankruptcy, 523.12[1] (15th Ed. Rev. 2005). Thus, the Court concludes the allegations of nondischargibility and the evidence in this case should not be examined under section 523(a)(6),

but rather should be reviewed exclusively under section 523(a)(2)(A) to determine if the Debtor is to be denied a discharged from the debt at issue.

Section 523(a)(2)(A) excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by — false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." To prevail under section 523(a)(2)(A), "a creditor must prove by a preponderance of the evidence that: (1) the debtor made a false representation; (2) at the time the debtor knew the representation was false; (3) the debtor made the representation deliberately and intentionally with the intent and purpose of deceiving the creditor; (4) the creditor justifiably relied on the representation; and (5) the creditor sustained a loss and damage as a proximate result of the representation having been made." *Field v. Mans*, 516 U.S. 59 (1995). In this case, the Debtor must concede elements (1) and (5): The Debtor's representations that CPSH would pay the debt to High Cotton were, with the benefit of hindsight, unquestionably false; and the Plaintiff sustained a loss of $545,289.72 after the Debtor's representations turned out to be untrue. Nonetheless, did the Plaintiff meet its burden of proving elements (2), (3), and (4)?

The Court will start by considering the evidence pertaining to the fourth element: Did High Cotton justifiably rely on the Debtor's representations? Various circumstances can be examined to determine if a creditor's reliance upon the debtor's representations was justifiable and reasonable. For example: What were the parties' previous business dealings? Were there events that should have put the creditor on notice that the representations were not well-founded? Would a simple inquiry or request for additional information have revealed the misinformation? What was the course of dealings between the plaintiff and debtor? What information was commonly known about the status of the debtor's particular industry?

As previously mentioned, High Cotton first sold textiles to CPSH on an open account basis beginning in September 1998. High Cotton's officers testified they stopped selling to CPSH in November 2000 because of CPSH's slow payment history. High Cotton's officers further testified that the entire Alabama textile industry, including High Cotton, was "slow" from a credit standpoint, and several textile companies had gone out of business. All this was known to High Cotton when it renewed credit sales to CPSH in March 2002. CPSH did not offer, and more importantly, High Cotton did not request any financial statements from CPSH or the Debtor. Very early in the renewed relationship, CPSH again became delinquent in its payments to High Cotton. No doubt because of the friendship between the Debtor and Caldwell, the opportunity to sell a large quantity of goods in an otherwise weak and perhaps dying domestic textile industry, coupled with the encouragement and optimism of the Debtor, High Cotton elected to indulge CPSH's slow payment habits and increasing account balance. Payments on the account were made on a regular, albeit tardy basis, but eventually the account balance increased to a high of over $660,000 before ending at $545,489 after the last payment was made. Based on these undisputed facts, the Court finds that High Cotton and its officers should have discounted the Debtor's optimistic projections of CPSH's ability to pay its debts. A simple request to review CPSH's financial statements for any of the years involved would have revealed its financial blight.

Although the Court finds that the Plaintiff was not justified in relying on the Debtor's assurances of payment, it remains worthwhile to consider whether the Plaintiff proved the second and third elements dictated by the Supreme Court in *Field* that are necessary to support a finding of nondischargeability under section 523(a)(2)(A). In other words, at the time the Defendant gave his assurances of payment, did he know his statements were false and were they made to intentionally deceive the Plaintiff? The Plaintiff takes the position that under Alabama law an insolvent purchaser

of goods on credit has a duty to disclose its insolvency to the seller-creditor, and if he fails to do so, he is guilty of fraud. In support of this position, the Plaintiff cites *Maxwell v. Brown Shoe Co.*, 21 So. 1009 (Ala.1897), *In re Collins*, 242 F. 957 (M.D. Ala. 1917), and *In re Whitewater Lumber Co.*, 7 F.2d 410 (M.D. Ala. 1925). The Court does not read these cases as standing for a rule that an insolvent purchaser of goods on credit is, *ipso facto*, guilty of fraud. The purchaser's insolvency at the time of purchase and extension of credit is a fact that should be considered in determining his intent. However, if bankruptcy courts were to adopt the Plaintiff's position, virtually every debtor would be denied a discharge for failing to announce his financial distress before incurring debt. A large portion, if not the majority of bankrupt debtors are insolvent or under severe financial distress when they obtain credit, but they are still entitled to a discharge of these debts.[8] "The debtor's insolvency or inability to pay does not by itself provide a sufficient basis for inferring the debtor's intent. A debtor's honest belief that a debt would be repaid in the future, even if in hindsight found to have been very unrealistic, negates any fraudulent intent." 4 Collier on Bankruptcy, 523.08[1][d] (15th Ed. Rev. 2005), *citing Chase Manhattan Bank v. Carpenter (In re Carpenter)*, 53 B.R. 724 (Bankr. N.D. Ga. 1985); *Montgomery Ward & Co., Inc. v. Blackburn (In re Blackburn)*, 68 B.R. 870 (Bankr. N.D. Ind. 1987); *Georgia Bank & Trust Co. v. McKinney*, 18 B.R. 607 (Bankr. M.D. Ga.

---

[8] The entire so-called payday loan industry was built on "serving" borrowers who, for the most part, are insolvent. After charging interest at over 400% per annum on some loans, how delighted these lenders would be if courts routinely ruled that their loans were not subject to discharge because their borrowers failed to affirmatively disclose their insolvency. In most cases, a quick look at credit reports or simple financial statements would put payday lenders on notice of their borrowers' insolvency. The mere fact that someone is seeking a loan from a payday lender might be considered sufficient in itself to put the lender on notice of probable insolvency. While the Court is by no means putting High Cotton in the same category as payday lenders, the same principal applies: When facts apparent to the lender are in conflict with the borrower's assurances of his ability to repay a debt, the lender is not justified in relying solely on the borrower's assurances. However, if the borrower intentionally hides information or furnishes false information, then the debt becomes subject to being exempted from discharge under section 523(a)(2).

1982).  The Court carefully listened to the testimony and observed the demeanor of High Cotton's officers and the Debtor.  Other than the poor financial health of CPSH, there was no substantial evidence to support a finding that the Debtor did not honestly believe that CPSH would eventually pull itself up by its bootstraps and pay High Cotton and its other creditors.  It was undisputed that CPSH, while under the control of the Debtor and his brother, continued to repay shareholder loans and make payments under the settlement agreement for which the Debtor was jointly liable with CPSH.  While these payments might provide some motive for the Debtor to misrepresent the ability and likelihood of CPSH to pay its debts, there was no question raised regarding the legitimacy of the shareholder loans or the settlement indebtedness.  The $750 monthly payments to the Debtor on his shareholder loan were hardly enough to keep at bay the Debtor's other creditors whose scheduled debts exceeded $225,000.

According to High Cotton's officers, the Debtor told them he would personally pay the account balance if CPSH failed to pay it.  The Debtor denies making such an unqualified guarantee but does admit that he committed to liquidate his personal assets and use the proceeds to keep CPSH in business.  The Debtor claims he did convert the equity in his personal assets to cash that was used as working capital for CPSH; there was no evidence the contrary.

If the Debtor did commit to personally pay CPSH's debt to High Cotton, such a commitment would constitute a guarantee to answer for the debt of another.  Under Alabama law such a guarantee is subject to the statute of frauds.  Ala. Code § 8-9-2 (1975).  The Debtor did not raise the statute of frauds as an affirmative defense.  However, even if the Debtor guaranteed CPSH's debt, his guarantee would still be subject to discharge unless, when the guarantee was made, the Debtor had no intention of honoring it.  The officers of High Cotton, and especially Caldwell, knew the Debtor's ability to personally pay any guaranty was no better than CPSH's ability to pay.  They had no reason

to believe the Debtor had income or wealth separate from that associated with CPSH. For the same reasons that High Cotton should have been suspicious of the Debtor's representations and assurances that CPSH would pay its debt, High Cotton could not have justifiably or reasonably relied on the Debtor's personal guarantee, assuming one was offered.

Like so many small businessmen faced with money problems, the Debtor believed he could work his way out of a large financial hole if given the time. Perhaps the Reebok business would have been a successful venture for both CPSH and its supplier, High Cotton, had CPSH not been saddled with such large pre-existing debts when it first landed the new business. Caldwell's friendship with the Debtor and High Cotton's desire for a reliable source of business in a troubled industry probably skewed the judgment of High Cotton's officers when they were put on notice that all was not well with CPSH when early in the renewed relationship CPSH became delinquent on its account payments. Once CPSH became High Cotton's major source of business and its account balance spun out of control, High Cotton had little choice but to "ride it out" with CPSH and the Debtor and hope their optimism panned out; unfortunately it did not. Under these circumstances, any reliance by High Cotton on the representations made by the Debtor that his corporation, or he personally, would eventually be in a position to pay the account balance was not justified or reasonable. Moreover, although representations by the Debtor of CPSH's and perhaps his personal ability to pay the account debt were not well founded, there was no credible evidence the representations were made to intentionally mislead the officers of High Cotton or that the Debtor did not honestly believe his representations were true. A person is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation. . ." *In re Reynolds*, 221 B.R. 828 (Bankr. N.D. Ala. 1998), *quoting Field*, 516 U.S. at 71. The evidence

supports a finding that the Debtor was guilty of being overly optimistic, but not of fraud.

For the foregoing reasons, the Court finds the evidence does not support a ruling that the Debtor's obligation, if such an obligation does exist, to High Cotton for the debt of CPSH should be excepted from discharge under sections 523(a)(2)(A) or 523(a)(6) of the Bankruptcy Code. Pursuant to Rule 9021 of the Federal Rules of Bankruptcy Procedure, the Court will enter a separate judgment and order consistent with this Opinion.

Dated: December 11, 2006

/s/ James J. Robinson
JAMES J. ROBINSON
United States Bankruptcy Judge